Good morning, if it pleases the court, my name is Kenneth P. Wilson, I'd like to reserve three minutes of time for rebuttal. I'm going to focus my argument here this morning, at the start anyway, on the two counts of vicar, violent crime, and aid of racketeering brought against Mr. Wilson, which related to the alleged murders of Michael Gollins and Alexandra Franklin. I think the law that applies to these type of charges is very hard to reconcile and distinguish. From my reading, the cases from the other circuits seem to be in tension. The statute says that to find a person guilty of this crime, there has to be showing that the crime was committed for the purpose of maintaining, entering a criminal enterprise. And the case law talks about that has to be an integral part of it. It doesn't have to be the sole purpose, but it has to be the dominant purpose. And that's where the problem comes in, in my view. There has to be some type of limiting framework to the application of the statute, because otherwise, any time someone is shown to belong to a criminal enterprise or gang, and then they commit a violent act, how do you decide whether that was in furtherance of the gang activity or not? There's got to be some principle that we can look at. The cases all say personal motivation doesn't count, but the proofs, as you read the different cases, are here's a criminal enterprise, they commit crimes of violence to further their drug trafficking enterprise, and to do this, do that, and maintain their posture as tough people in the community. And if someone looks at them askance, they've got to kill them because that keeps their position in the gang. Well, okay, all these cases, if you look at them very carefully on the factual basis of the case, they're all different than what happened in this case, in my opinion, if you're going to actually apply the law carefully. And I'm calling on a careful application here. Why is that? There's got to be some time linkage to show that the defendant bought into, agreed to, was part of some ethos of if you disrespect me, I'm going to do something to you. Well, I mean, there's certainly reason to think that's true with regard to Mr. Wilson, right? I mean, he's a full-fledged, he's the young, was he the young original gangster? He writes a letter. Right, so he's the one who writes the note and says, you know, I'm Y.O.G. and sort of. Sure. Okay, so, I mean, that's a pretty high rank. We could certainly, a jury could certainly infer that he fully bought into this gang ethos, for starters here, right? I disagree. Really? The letter was written in 2010 when he was locked up. These alleged Vicar crimes are 2008. This so-called gang is an amorphous entity that starts at some early point, goes to some future point, but in terms of I'm doing stuff because I'm in the gang, it's not proven in this case because. We're talking about a sufficiency argument at this point, right? Sure. Okay, I mean, surely there's sufficient evidence for the jury to say that he's a full-fledged member of the gang when he kills these people. It was conceded that he was a member of the gang when these incidents occurred in 2008. And then, and so he kills Goins, who is a member of another gang, and Goins is supposedly going to get him, right? Right. And then he kills Franklin, who's a girlfriend of another gang member, of another, different gangs. Those are the allegations, right, that were presented? So, and I think there was evidence that would allow a jury to certainly conclude that Franklin was dating the guy that they originally were trying to find when they're driving around that day. Isn't that fair? Fair. So, I mean, is it really that big a leap for the jury in this case? I mean, I understand your concern about can't criminalize every violent action, can't bring it under this statute that a gang member commits. But in this case, they get in the car, they're looking for this guy who's in the other gang, and they don't shoot him, they shoot the girlfriend. Why? Because she's the girlfriend of somebody in the other gang. Now, doesn't that tie into, you know, the gang ethos of attacking your opposition, et cetera? It's not self-defense or anything. Well, here's how I would look at that episode. Well, couldn't, my question is why couldn't a jury look at it the way I just described? We could sit here and hypothesize, but Jackson versus Virginia, that is not our mandate. Sure. Could any rational jury view this as motivated by gang membership and the goals of the gang to attack and combat other gangs? Franklin's murder. The jury has to find that the purpose of the activity of killing the girl did something to promote, maintain, et cetera, the group activity. My argument is that as to Ms. Franklin, what may have started out as some gang activity transmuted into some personal activity. That's my argument as to that Franklin case. And what reason does he have to get the whole car full of gang members to unload their pistols? Well, they start off as, let's say, let's concede that they start off on a gang mission. Right. They'll get a member of an opposing gang. It was Killa something, right? Some other person. Her boyfriend. I forget the name, but they see one person, there's a police officer, they don't go for him. Right. There's a guy at a gas station. Right. They don't go for him. They see another car. They think that's another gang member person in the car. Turns out it's the victim. But if you accept the testimony, there's statements of, he would get your girlfriend if you don't, why don't you get his girlfriend before he gets yours type of thing. But there's no way a jury has to believe that that is the rationale. Isn't that fair? I mean, there's... What is the evidence, though? I mean, why... The evidence is they're driving around looking for somebody to kill from the other gang. And there's a guy pumping gas and they want to kill him, but, you know, they're worried about, for some reason, and then they go to this guy's house or something. I mean, you know, it's gang, gang, gang, and then all of a sudden, as a matter of law, it's no longer gang when they start shooting at Franklin. That's my argument as to Franklin. I'm out of time. Okay. I'm sorry. I don't mean to... I'll come back to Mr. Goins on rebuttal. All right. Thanks, Mr. Table. May it please the court, John Bailey on behalf of Ron Darius Williamson, and I'd like to reserve one minute for rebuttal, if I may. All right. First, I apologize for my ignorance of appellate procedure in not requesting permission to use the poster board that I brought in today. I understand that the court has very generously said that I could use it for the argument, and I appreciate that. I don't know if it's helpful or not. I thought that it might be. These are still photos taken from the surveillance video at Tennessee State University Gentry Center on May 18, 2009, the date that Andreas Taylor was killed. And I have copies of these for the court and law clerks, if you want them. The top left photo just shows the east entrance to the Gentry Center. It's an unobstructed view of that. That's where the camera was trained on or about that area from early in the day until long after Mr. Taylor had been killed. Mr. Taylor was shot at the west entrance, which is over on this side over here, and went down the hill, fell down the hill, and died. This photo is taken from 19 hours, 3 minutes, and 47 seconds, which is about 5 or 6 seconds after the shooting took place. And there wasn't any disagreement about when the shooting took place at trial because you could see a rush of people coming out this east door. You can see them coming out there. What this shows is a young man in a white shirt with his hands going down the pants in front of him. Eight seconds later, this next picture is taken. It shows another young man in a white shirt coming out again with his right hand going down into his pants. The fourth picture that I have here is taken 12 seconds after the shooting, excuse me, after this second gentleman came out the door. Approximately 20 seconds after the shooting. This is Officer Don Black, 24-year veteran of the Nashville Metropolitan Police Department. Officer Black was on duty that day. He was in the gymnasium at the time the shooting took place, heard the shooting, came out in the foyer, talked to witnesses very quickly who all told him the shooters went out that door, pointing to the east entrance door. Several witnesses he talked to all said the same thing. He testified at trial. They pointed to the door and said they went out that door. Officer Black started to go out the door, hesitated for just a second because he thought, I better get back up. The shooters could still be right outside this door. Waited, got back up, and came out with his gun drawn because the information he had was the shooters had gone out that door. The photo down here is taken about 12 minutes after the shooting. This is of Ron Darius Williamson, Adrian Montgomery, government witness, Terrence Jones, Anthony Lampkins, and Marquis Cooper, defense witness. All five standing right around here, right outside the east entrance door some 12 minutes after the shooting took place. Ron Darius was identified at trial by government witnesses and defense witnesses. Wearing the white shirt there? No, wearing the black shirt. It's hard for me to follow. It's wearing the black shirt right here. And this last photo is the last frame that Ron Darius and these other people are in, which is about 8 minutes later. So what's the upshot of that narrative? The upshot is Ron Darius Williamson was wearing a black shirt, black pants, black hat on May 18th. That was testified to not only by defense witnesses, but by government witnesses, Adrian Montgomery and Miranda Morgan, rebuttal witness. And which of the prosecution witnesses say the killer was wearing light colored clothing? The white shirt. Aisha Bonner testified that the shooter, who she said was Ron Darius Williamson, was wearing a white shirt. And she is the only person who anybody spoke with at the time of the shooting who said that the shooter ran in the opposite direction. Coincidentally through the gym where Officer Black was working. There was total chaos, right, after these shots go off? I certainly think so. The government argued with regard to the identification issue that it wasn't chaotic at all. But there was certainly testimony at trial that it was total chaos at that time. People can get confused about which direction somebody is running in that sort of scenario. And yet still be correct that that person was a shooter. I mean, right? Well, I suppose you could make the argument that the person could be incorrect about a lot of things and still be correct about the shooting. But at some point it begins to strain credulity when nothing else matches up with what that witness is saying. I guess, I mean, the challenge that you have here is that we apparently have, I think, three witnesses who said that Mr. Williamson was the shooter. And their testimony conflicts on, you could say, collateral points. Now, I commend you for your vigorous advocacy in the briefs and everything. But, I mean, you have to understand the standard that we're dealing with here, all right? So the T-shirt or, you know, he ran this way but not this way. I mean, that's collateral to whether he was the one who shot. And so, I mean, how do you square these areas of disagreement with the Jackson standard? I mean, are you saying that no rational jury could believe any of these witnesses about who the shooter was? Yes. And with all due respect, I think you overstate the government's evidence considerably there. Well, they have three. And I understand your point about social science with, you know, memory transference and all that. I mean, take my word, I take that seriously. But it reads like a cross-examination outline, not, you know, a reason why a court of appeals can reject a witness's testimony. What's your response? Well, the witness's testimony, first off, let's start with the statement that there are three government witnesses that saw the shooting. That's not accurate. One government witness, Acacia Bonner, said that she saw the shooting. Kaylin Cunningham is one of the three people you're talking about. The government completely abandoned his testimony at trial, didn't argue it at all, because Kaylin Cunningham has Ron Darius Williamson coming out this east entrance door. And let's be clear about one thing, okay? Please, I hope we can agree on this. If the shooter came out the east entrance door, Ron Darius Williamson was not the shooter. Because the video camera is on there. Ron Darius Williamson never comes out the east entrance door. That's why the government abandoned Kaylin Cunningham at trial. I know they've resurrected him on appeal here, but at trial, they can't have his testimony. They didn't argue Officer Black's testimony, because they can't have that. No, it was in and the jury heard it. Can you point us to any case where a court of appeals said there was insufficient evidence to support a conviction when there was a witness who said that they saw the defendant commit the murder? Any case ever that does what you're asking us to do. I mean, I fully appreciate your points about conflicting and doors and, you know, boy, doesn't that raise a reasonable doubt. But is there any case where somebody said, I saw that defendant shoot the victim, where a court of appeals, federal, said the jury was not entitled to believe that? I believe the Scott case. I believe Brown. The Scott case is a section 1983 car chase case, right? This court has said it applies. I'm talking about, I'm asking for a more specific story. I mean, I'm not saying it can't be done, but I am asking, and I think it's germane. Has any court of appeals, federal circuit, ever helped that a jury was not entitled to believe a witness's firsthand testimony that she firsthand saw the defendant kill the victim? My time's up. That's okay. Are you aware of any such case? I believe that Scott, Brown, and Parker all say that, Your Honor, because the point being if the testimony at trial conflicts with objective hard evidence, and that's what it does in that case. But you're talking about the Scott car chase section 1983 case. U.S. Supreme Court case. Right. Okay. It's a civil case. I understand. I mean, and I understand your argument, and I understand you're trying to extend that principle, but the answer to my question sounds like no, because Scott is a civil case. Well, this court said it in regard to a motion to suppress, that if a witness's testimony at the motion to suppress conflicts with direct hard evidence, I forget if it was a video in that case or not. I think it was a video, maybe an audio, but I believe a video tape. In that case, no, it's not entitled to belief if it conflicts with hard evidence. I understand your argument. I just wanted to see if anybody had ever done this before. Thank you. Good morning, Your Honors, and may it please the Court. Dave Lieberman for the United States. Both defendants have focused their presentations on the sufficiency claims, so I'm going to follow where they have led, starting with Mr. Wilson and moving on to Mr. Williamson. For Mr. Wilson, he does focus on this purpose element of the Vicar Statute, the requirement that he committed the murders for the purpose of maintaining or increasing his status within the gang. The district court further defined that purpose element to say that it had to be a substantial purpose. That is actually quite similar to what the instructions of the Ninth Circuit approved in the Banks case that Wilson has cited repeatedly throughout this litigation. The government's evidence on this element was sufficient. We proved this in two steps. The first was some of the evidence that Judge Kethledge referenced earlier. I call this the generalized testimony about the customs, rules, and expectations of the gang, the requirement that everybody put in work, the rule that if a crab, if a rival gang member disrespects, you handle your business, which means shoot them, fight them, possibly kill them. And they took oaths and prayers glorifying violence and retaliation. Because Mr. Wilson was in the gang, he was a full-fledged member of the gang, the jury could reasonably infer that he was aware of all these customs, norms, and rules. On the specific evidence tying these murders to a gang-related purpose, Judge Kethledge mentioned the status of both victims. Michael Goines was a member of a rival gang who had told people he was out to get Mr. Wilson. I mean, there could be a self-defense rationale for that one. Yes, but the question would be was the jury required to assume that? And courts, of course, have said defendants can have mixed motives in this case so long as the gang motive is a dominant or substantial or primary purpose. And the fact that both victims had connections to rival gangs in some respect, it was a key aspect of the government's evidence here and also was a key aspect of numerous other court opinions interpreting this provision. I would also encourage the court to look at Mr. Wilson's actions leading up to both murders. For the Goines murder, he actually wanted to shoot Goines several days before on the street but was stopped by a supervisor, an original gangster, an OG. And so he discussed the matter with the OG, so that shows some gang connection. And then, as the court mentioned earlier, before Franklin's murder, Mr. Wilson was present with three other Bloods members. They went out, they almost shot a rival Crip member, Archie Henry, discontinued their pursuit when the police showed up, and then went to another neighborhood, saw Alexander Franklin, and it was Mr. Wilson who said, that's Alexander Franklin, that's Clarence Killapoo Shaw's girlfriend, let's get her. The other members hesitated, and then Mr. Wilson reminded all of his fellow gang members that Killapoo Shaw had threatened one of their girlfriends. And the case law is replete. When you bring in your fellow gang members into this type of violent act, it now serves a gang-related purpose. Final point, we know that several days after the Goins murder, another gang member writes a letter noting that Mr. Wilson had been promoted to baby gangster. I think this is less than a week after the Goins murder. And then at some point after the Franklin murder, after Mr. Wilson is in jail, he starts signing his letters as YOG, Young Original Gangster. That's two promotions during the time period that we're talking about, and the testimony was clear. To raise in rank, you have to put in work. And these murders are certainly classic examples of putting in work. So the jury in this case could easily reach the conclusion of a gang-related purpose. Let me switch over to Mr. Williamson. His sufficiency argument is the government did not prove that he was the shooter. Let me quickly review the government's evidence on this front, and then I'll return to my friend on the other side's argument about the security camera video. We had motive in this case. Andreas Taylor and Mr. Williamson were involved in that giant gang brawl at Club Faded the night before the Gentry Center shooting. During this brawl, Mr. Taylor beat up Mr. Williamson. Again, gang rules dictate if a crab disrespects, handle your business. So that's background. He was an obvious target. It's undisputed that Mr. Williamson was present at the Gentry Center. The government called three witnesses, and when their testimony is viewed collectively, established the linkage between Mr. Williamson and the shooter. Adrian Montgomery, fellow Bloods member who was with Mr. Williamson, on the second floor of the Gentry Center, saw Mr. Williamson receive a gun from another gang member. They walked down. Mr. Williamson went out ahead, and then they heard shots. Acacia Bonner, the 16-year-old girl. Wait, they heard shots? I mean, whose testimony are you referring to? I'm sorry, this was Adrian Montgomery's, the rival gang member. They were coming. I don't have it in front of me. He's one of the three? Yes. And so he hears shots? I believe the testimony was that he saw Mr. Williamson run ahead and immediately go out the door and then instantly heard shots. Which door? There was not testimony from Mr. Montgomery on that point. Acacia Bonner saw Mr. Williamson on the second floor. Her attention was drawn to him because she said, I thought he was attractive. Several minutes later, she's walking down those same steps, sees a man, pull out the gun, and then fire. And then later she says to the police, I'm 80% sure that that was Mr. Williamson. Doesn't that hurt you more than it helps you, 80% sure? We don't send people to life in prison, right, for 80%? If Ms. Bonner was the only piece of evidence the government had, that would not be enough for reasonable doubt. Did she then elevate her level of certainty at trial or something? Actually, during the government's case, the prosecutor brought out the fact that she said 80%. And if I'm remembering correctly, the defense cross-examined on that point. So the fact that she said 80% at the police lineup was laid bare before the jury. Kalon Cunningham, he was outside the Gentry Center, saw Mr. Williamson several minutes, a minute or two after the shooting, and said that he had a gun. I may be misremembering the trial transcript, but I don't remember any testimony contrary to my friend on the other side who says that about which door the shooter came out of. And so all his testimony was, I saw Mr. Williamson outside immediately after the shootings with a gun. And I also want to point out that the government put forth several pieces of evidence that I would call confirmatory of the conclusion that Mr. Williamson was the shooter. There was a very suspicious phone call from jail where he and an unidentified woman are talking about the Gentry Center shooting, and he says, quote, everybody needs to stick to the same story, we're going to get through this shit. He writes a letter to Adrian Montgomery, who ended up cooperating with the police, and tells Montgomery to, quote, stay tree high and keep your mouth shut. Final point on this confirmatory evidence, the jury would have seen at trial that Mr. Williamson had face tattoos, and on his face were six letters, TTP, Treetop Hero, that's the name of his Bloods gang, and then also TSU, Tennessee State University, where the shooting took place. And the jury could reasonably infer from these tattoos that Mr. Williamson had a strong connection to the shooting there, given the fact that he- This isn't very important, I'm pushing you over the line on this. No, I think, as I said, it's confirmatory of what the eyewitnesses, and we're here on sufficiency if you line up everything that I just mentioned. Viewed in the light most favorable to the jury's verdict, it easily establishes Mr. Williamson's identity as the shooter. Now, returning to the security camera video, and Mr. Williamson characterized as hard evidence exonerating him, the jury did not have to accept that. As I understand Mr. Williamson's chain of inferences here, it's that the shooter had to go out the east door, and then the security camera had to capture that, because Mr. Williamson was not on that camera, ergo he's not the shooter. Two problems with that, first of all, there's no concrete evidence that the shooter went out any particular door. Mr. Williamson relies quite a bit on Officer Donald Black's testimony. Officer Black was the first officer who responded to the scene. He said that a witness, or maybe multiple witnesses, said that they thought the shooter went out that door. That's hearsay. Those witnesses were not called at trial. We don't know if those witnesses' accounts were correct, and so perhaps the shooter did not actually go out the door. But even, let's accept the premise that he did go out the door. Would the security camera have necessarily captured the shooter? And the answer is no, and the government will happily provide if the court requests copies of the security video footage that's been referenced today. This was not a stationary camera focused on the door. Throughout this entire time, the camera actually pans door to the area outside the door, and then at some point to the driveway back again. The camera also zooms in and zooms out, so the doors are actually never always in complete focus of the camera. The video is also incredibly grainy, and so it is possible that the camera may have missed Mr. Williamson if he indeed came out those doors. Perhaps the defense has presented another reasonable explanation, but that's not. We're here on sufficiency, and all we have to show is that the government has passed muster in a light most favorable to the jury's verdict. What about the clothing? Yes, Your Honor. Well, there was inconsistencies to the government's witnesses who said Williamson was wearing all black, and Acacia Bonner who said he was wearing a white shirt. That is an inconsistency. The defense harped on that quite a bit at trial to show that these witnesses' accounts were unreliable. The district court instructed the jury about how to treat inconsistencies, and the jury was entitled to reject that. Ms. Bonner was, they may have thought that Ms. Bonner was focusing on Mr. Williamson's face. There's an old Scalia opinion that there's a reason why the Lone Ranger wears a mask and not a cape, because people look at faces and not necessarily clothing, and that may have been the jury's conclusion here. Again, the inconsistency is a great jury argument, and actually a number of the arguments that Mr. Williamson makes now, they're arguments to make on a motion for a new trial when the district court is sitting as another juror assessing credibility, and he did that. Judge Trauger denied it. He has not appealed the denial of his motion for a new trial. That's the vehicle by which this court could review these credibility determinations about witnesses and whether or not the government's witnesses were so beyond the pale, but not on sufficiency. So the government's test, I mean, the evidence that you have that you've just recited doesn't pinpoint one door or the other. None of those witnesses. The government's evidence did not pinpoint a particular door. And so you're kind of agnostic on which door the shooter runs out? Yeah. But your point is that's not an element of this offense. And that was not the basis of the government witness's testimony. So it was a great defense theory to argue to the jury, but it doesn't go to undermine the government's case here. The defendants have raised a number of other claims with respect to evidentiary claims and jury instruction claims. I'm happy to answer any questions if the panel would like, but I'm also happy to submit on my briefs for those claims. Is Acacia, what's her last name, Connor? Bonner. Bonner. Is she the only witness who talks about the clothes, the color of the clothes? I mean, does Montgomery say, well, I guess? I mean, the only inconsistency between what he was actually wearing and what a witness said, a government witness said, is her testimony that he's wearing a white shirt. White shirt, black pants. The other government witnesses said all black. All right. Thank the panel. Thank you. Any rebuttal? Thank you. I did want to come back to Mr. Goins because that's a separate serious charge. The proof there is very tenuous in a gang relation, apart from the fact that the two purported principals, the victim and Mr. Wilson, are members of so-called rival gangs. There's no proof that Mr. Wilson held some role in this gang where if there was ever some issue with another gang that he was a designated person to take care of it. No proof of that whatsoever. In other words, he does not hold a rank as enforcer or leader or anything like that where that's his job to take care of any and all threats that come around. I maintain as to Goins, this was some sort of potentially personal problem that the record is a little bit unclear, but somebody hears Goins say he's going to get Wilson. I think that's Mr. Tate says that. I think later on Mr. Tate says he thought maybe it was about a girl, and that's about it. One other witness, Mr. Clark, says Goins had some beef with the Bloods. I don't know what that means. The actual incident, but surely that cannot be enough to convert the later incident because this earlier beef is not really related in time to the killing. We don't know when it happened. We don't know who was there. We don't know what it involved. But the actual episode itself, there's different versions of what happened, but everyone agrees that a non-gang person, a Reggie Ba, also shoots Mr. Goins. What does that have to do with anything, and how does that convert this episode into some type of gang-related crime of violence? So that's my discussion of Mr. Goins. The law is not that mere gang membership and gang members doing something together makes the crime of violence a Vicar action. The Ty case, T-H-A-I, which I have cited in my brief and which is referred to in the case that counsel submitted to the court on his 28-J letter, is precisely a case holding insufficiency of the evidence when a gang leader and two gang members committed an arson together for money. It was not linked to the gang activity or enterprise and was held to be insufficient. So that court has construed the statute more narrowly, and so I think there's a great danger here because we dislike gangs as we should. It's reprehensible activity. We don't want to favor them, but the law is the law. Otherwise, if you allow this generalized sort of floating testimony about gangs do this and gangs do that without linking it to show that Mr. Wilson had to know this, Mr. Wilson had to know that, Mr. Williams, their star witness, talks about all this stuff occurring in 2010. Mr. Wilson is even there earlier in time. The gang is very amorphous. They're feuding with each other. They're shooting each other. They're doing all kinds of things independently. The complaint letter that Mr. Little said writes saying Wilson got some increase in rank. In the same letter he says everybody's doing their own thing. We're not working together, et cetera, et cetera. It's very contradictory evidence and I think was insufficient to permit a reasonable jury to conclude beyond a reasonable doubt that these were gang-related crimes of violence. Thank you. Thank you. Mr. Bailey. The government says that their three witnesses' testimony viewed collectively is enough. They can't be viewed collectively. They're completely inconsistent with each other. The government abandoned Adrian, excuse me, Caitlin Cunningham's testimony because it was inconsistent with their theory of the case. Adrian Montgomery's testimony was conclusively disproved by the video. He admitted it. He admitted that his initial testimony was incorrect because the video showed it to be incorrect. Because he's not coming out the east entrance? Is that why? Because he has them meeting up on a different part of campus when, in fact, as those pictures show, they're right outside the east entrance. That's several minutes later, right? A few minutes later, but that was an integral part of his story. That's highly collateral, though. I mean, you know, a jury can accept certain parts and not that, right? Well, in this case, the jury has to pick one little bit out of each person's testimony and ignore 99 percent of it. And to answer your Honor's question, Acacia Bonner did elevate her level of certainty from 80 percent to 100 percent after almost three years. And I know you said you're familiar with the social science studies. They all say that doesn't happen outside of the cases. Quick question. Is the basis for your saying that he just absolutely goes out the east door, is that only the officer's testimony or is there another? Alan Cunningham said, with all due respect, that that was his testimony, that he's coming up on the scene, he sees Ron Darius Williamson, and he says two or three other guys coming out the east entrance door and sees a gun in their hand. So Cunningham and the officer that was in the center both say Williamson goes out the east door. Alan Cunningham says Ron Darius Williamson comes out the east door. Officer Black says the shooter goes out the east door. He has no idea who it is. He just says everybody there, and it was more than one witness. There were a number of witnesses said pointed. He said they pointed to that door. That's where the shooter went out. With the permission of the chief judge, given how much argument we've had about this video, I think it would be helpful to get the video. We've seen stills. Mr. Lieberman, the government said that they could provide it to us. Are you okay with that? I'd love for the court to have it. There were two exhibits. There was exhibit 19CCC, which is a shortened version that's right around this time, and if the court views that, you'll see that while in the longer version, which is 19EEE, yes, the camera does pan around. At the time of the shooting, minutes before the shooting, minutes after the shooting, it is trained on this door. You'll see that from the video. If Ron Darius Williamson had been the shooter and come out that door, it's on that video. Okay. Well, just get us whichever versions you all think are helpful. Yes. Thanks. Thank you very much. Thank you very much. Mr. Cleveland and Mr. Bailey, I know both of you have taken these cases under the Criminal Justice Act and know you do that as a service to the court, so we're very grateful to you, and your representation has been exemplary, so thank you very much. That concludes this matter. There are no further cases submitted. There being no further cases, the court may adjourn court.